# Syllabus

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

**This syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader.**

Reporter of Decisions:
Kathryn L. Loomis

## EL-JAMALY v KIRCO MANIX CONSTRUCTION, LLC

Docket Nos. 164902 through 164904. Argued on application for leave to appeal January 10, 2024. Decided July 18, 2024.

Shareef El-Jamaly filed a lawsuit in the Wayne Circuit Court against Kirco Manix Construction, LLC, DTE Electric Company, and others, alleging negligence and premises-liability claims. Plaintiff was employed by a subcontractor on a construction site where Kirco was the general contractor. Plaintiff was carrying a bull float (a long-handled aluminum tool used for smoothing concrete) when it contacted or came near a high-voltage power line owned by DTE. Plaintiff was electrocuted and sustained serious injuries. Plaintiff alleged that Kirco was liable for the negligence of its subcontractors under the "common work area" doctrine and that DTE was negligent because it was aware of the danger presented by its high-voltage power lines and was asked to remediate that danger but failed to do so. Kirco and DTE moved for summary disposition, and the circuit court, Sheila A. Gibson, J., denied the motions. In an unpublished per curiam opinion, the Court of Appeals (GADOLA, P.J., and CAVANAGH and K. F. KELLY, JJ.) reversed the circuit court and held that Kirco and DTE were entitled to summary disposition. The Court of Appeals concluded that Kirco was not liable under the common work area doctrine and that DTE did not owe a duty of care to plaintiff. Plaintiff sought leave to appeal in the Michigan Supreme Court, and in lieu of granting leave, the Supreme Court ordered oral argument on the application. 511 Mich 909 (2023).

In an opinion by Justice WELCH, joined by Justices BERNSTEIN, CAVANAGH, and BOLDEN, the Supreme Court *held*:

Plaintiff presented sufficient evidence as to Kirco and DTE to survive summary disposition. As to Kirco, there were genuine issues of material fact concerning three of the four elements of the common work area doctrine. As to DTE, there was a question of material fact as to whether the power lines were properly maintained.

1. Ordinarily, general contractors are not liable for the negligence of their subcontractors or the subcontractors' employees unless a plaintiff can establish a claim under the common work area doctrine. To do so, a plaintiff must show that (1) the defendant (either the property owner or the general contractor) failed to take reasonable steps within its supervisory and coordinating authority (2) to guard against readily observable and avoidable dangers (3) that created a high

degree of risk to a significant number of workers (4) in a common work area. As an initial matter, this Court had to consider the definition of the risk of harm that plaintiff faced on the job site. The Court of Appeals defined the risk of harm as "the risk of electrocution from use near the power line of high-reaching conductive tools or equipment capable of reaching the power lines." Although the Court of Appeals properly defined the risk of harm, it failed to recognize that genuine issues of material fact remained by which plaintiff could satisfy the common work area doctrine.

2. As to the first element of the doctrine, there was no dispute that Kirco was the general contractor on the job site where plaintiff was injured. With respect to the second element, although the Court of Appeals concluded that Kirco took reasonable steps to address the danger, noting that the power line was at a proper height and in good repair, the record was not clear as to this issue. There was a factual discrepancy in the record about the actual height of the power lines. The relevant safety organization set the minimum clearance standard for the height of power lines at 18 feet seven inches at its lowest point. The record indicated that the power lines in this case were measured at 27 feet 4 inches and at 20 feet, with a sag in the line of 3 feet at its lowest point, meaning that the line may have been only 16 or 17 feet off the ground. This discrepancy was significant in considering whether Kirco's actions were reasonable. Additionally, the record was not conclusive that Kirco took reasonable steps within its supervisory authority to guard against the power-line danger. While Kirco took measures to manage safety on the job site, there were questions of fact as to the reasonableness of its actions with respect to the power lines and whether these measures were sufficient to guard against the danger. For instance, a warning sign at the job site blew down and was not replaced before plaintiff was injured, and plaintiff was using a metal bull float, which raised questions concerning Kirco's agreement to provide safe tools to workers at the job site. Because of the unresolved factual questions, whether Kirco was reasonable in its actions to guard against the danger was an issue best left to the jury to resolve.

3. The Court of Appeals' conclusion that plaintiff did not establish the third element of the common work area doctrine because only plaintiff and perhaps one other employee were imperiled ignored the extensive record regarding the risk of electrocution to the other building trades who worked on the job site. The record indicated that employees of several other subcontractors worked in proximity to the power line that electrocuted plaintiff, using equipment that could reach the line. And the Court of Appeals wrongly held that an incident involving a tree-removal subcontractor, whose employee severed a power line with a boom excavator, was not relevant because the incident occurred seven months before plaintiff was injured and because the tree-removal subcontractor was not injured. But this analysis added two requirements to the common work area doctrine: a temporal limitation and a prior injury requirement. However, there is no temporal limitation under the common work area doctrine as to when a general contractor can be put on notice of a danger when incidents occur on the same work site on the same project. To have a "common work area," all that is required is that the employees of two or more subcontractors eventually work in the same area. Additionally, the doctrine does not require that someone first be injured. Negligence is rooted in foreseeability; therefore, adding a "prior injury" requirement to the common work area danger analysis would mean that a risk is never foreseeable unless an injury has actually occurred. That would make a subsequent accident not just "foreseeable," but *foreseen*, which is not the test. Moreover, there were factual disputes as to the incident involving the tree-removal subcontractor, with plaintiff claiming that the incident occurred along the same

span of power lines where he was injured, and the Court of Appeals stating that the two incidents occurred in different locations. Therefore, summary disposition was premature.

4. Regarding the fourth element of the common work area doctrine, the Court of Appeals determined incorrectly that there was no evidence that any subcontractors other than plaintiff's employer were using high-reaching conductive tools or equipment capable of reaching the power lines. The evidence established that multiple subcontractors used equipment on the job site that could reach the power lines, including the tree-removal subcontractor. At a minimum, there was a genuine issue of material fact regarding whether plaintiff's injury occurred in a common work area, especially when viewed in the light most favorable to plaintiff.

5. Whether an electric utility should be held responsible for an injury caused by contact with electrical wires involves a negligence analysis. To establish a negligence cause of action, a plaintiff must prove that the defendant owed the plaintiff a legal duty, the defendant breached that duty, the plaintiff suffered damages, and the breach was a proximate cause of the damages suffered. Additionally, before a duty can be imposed, there must be a relationship between the parties and the harm must have been foreseeable. In this case, whether DTE owed plaintiff a duty rested upon whether the power lines were improperly maintained and whether contact by conductive equipment was foreseeable. The Court of Appeals granted summary disposition to DTE on the basis that plaintiff did not allege that the power lines were improperly maintained and that plaintiff carrying the bull float vertically was not foreseeable. But there were genuine issues of material fact on those points. First, the parties disputed whether the power lines were hanging at a safe height. The height of the lines was relevant to the determination of whether they were properly maintained, and hence, whether DTE owed plaintiff a duty. Disputed facts, even when related to duty, must be resolved by the jury. Second, if the power lines were improperly maintained, then the court must determine whether a duty existed by considering whether plaintiff's injury was foreseeable. The facts demonstrated that DTE was well aware of the danger posed by the power lines. Kirco and the property owner discussed the danger posed by the power lines with DTE before the project began. Additionally, there were factual disputes about the condition of the power lines, and the evidence demonstrated that DTE knew that tall or high-reaching metal tools could potentially come into contact with the power lines. Aside from the factual discrepancies regarding maintenance of the lines, the evidence demonstrated that a bull float coming into contact with the power lines was foreseeable. A court must also determine whether the risk of harm to the victim was foreseeable. The Court of Appeals concluded that the risk of harm was not foreseeable because DTE could not have foreseen the precise manner in which the injury would occur, but this is not the standard. However, as stated in *Schultz v Consumers Power Co*, 443 Mich 445 (1993), a plaintiff need not establish that the mechanism of injury was foreseeable or that it was anticipated in specific detail, but only that some injury to the plaintiff was foreseeable or to be anticipated. A DTE representative acknowledged before the injury that line protection was needed, showing that he was aware of the danger that the lines presented. Therefore, the Court of Appeals erred by definitively holding that DTE did not owe a duty to plaintiff.

Reversed and remanded to the trial court.

Chief Justice CLEMENT, concurring in part and dissenting in part, joined Part V of the majority opinion because she agreed that the Court of Appeals erred by reversing the trial court's

denial of summary disposition as to DTE on the basis that DTE did not have a duty to plaintiff. A genuine issue of material fact existed as to whether the power lines were improperly maintained. However, Chief Justice CLEMENT joined the dissent as to Parts I through IV of the majority opinion because she agreed that the Court of Appeals correctly held that plaintiff failed to establish a claim under the common work area doctrine and that there was no legal basis to apply the doctrine because there was not a high degree of risk posed to a significant number of workers on the job site.

Justice ZAHRA, joined by Justice VIVIANO, dissenting, disagreed that the common work area doctrine was applicable when only plaintiff was exposed to the danger posed by the power lines. Specifically, he disagreed that there was a genuine issue of material fact as to the third element (a high degree of risk to a significant number of workers) and the fourth element (a common work area) of the common work area doctrine. Regarding the third element, although the power lines posed a modicum of risk to every worker on the job site, the common work area doctrine is not satisfied by the mere inherent risk of a project; rather, plaintiff had to show that the power lines posed an actual danger to a significant number of workers such that it was more economical for the general contractor to protect against the risk than for individual subcontractors to do so. Plaintiff's suggestion that DTE employees were put in danger by the lines was not persuasive because the risks to the DTE workers, in using a crane to install switch cabinets, was foreseeable. The DTE workers operated a crane above ground and near power lines, whereas plaintiff was working on the ground, laying a concrete drive. Therefore, the DTE workers were not exposed to the same risk as plaintiff. Indeed, DTE shut off electricity to the lines when its employees used a crane near them, so the DTE employees were never actually at risk from the lines. Meanwhile, the majority opinion cited the danger posed by the lines to the employees of the tree-removal/mass-grading subcontractor, but the fact that only two subcontractors and seven workers were potentially endangered by the power lines and that these incidents occurred several months apart did not indicate that there was a hazard that threatened a significant number of workers. Regarding the fourth element, plaintiff did not show that the area where he was injured was "common" among multiple subcontractors. The DTE workers did not work in the same hazardous area as plaintiff because the power lines were de-energized when the DTE workers worked near them. And plaintiff presented no evidence that the employees of the tree-removal subcontractor used high-reaching conductive equipment while working near the power lines. Thus, the risk plaintiff was exposed to was not a risk that he faced in common with either the DTE workers or the tree-removal subcontractor, and plaintiff did not labor in a common work area with the DTE workers and the tree-removal subcontractor. With respect to DTE, contrary to the conclusion of the majority, plaintiff did not establish that DTE was negligent where plaintiff failed to show that DTE owed him a duty of care. A defendant only has a duty to protect against foreseeable injuries. Plaintiff was an experienced worker and was aware of the dangers posed by power lines; he was also trained to avoid the dangers posed by power lines. The evidence established that it was not foreseeable to DTE that plaintiff would carry a long, conductive metal pole directly beneath power lines. Rather than focusing on plaintiff and his experience, the majority changed the nature of the inquiry in power-line tort cases to focus exclusively on the utility company: here, whether DTE took proper steps to ensure reasonable safety at the job site, whether it properly maintained the lines, and whether contact with the lines by a metal bull float was foreseeable. These questions involved the question of breach and not the question of duty.

# OPINION

Chief Justice:
Elizabeth T. Clement

Justices:
Brian K. Zahra
David F. Viviano
Richard H. Bernstein
Megan K. Cavanagh
Elizabeth M. Welch
Kyra H. Bolden

FILED July 18, 2024

S T A T E  O F  M I C H I G A N

SUPREME COURT

SHAREEF EL-JAMALY,

Plaintiff-Appellant,

v                                                                No. 164902

KIRCO MANIX CONSTRUCTION, LLC,
KIRCO DEVELOPMENT, LLC, and DTE
ELECTRIC COMPANY,

Defendants-Appellees,

and

KIRCO-OM PLYMOUTH, LLC, OERLIKON
METCO (US) INC., GHAFARI
ASSOCIATES, LLC, GHAFARI, INC.,
NATIONAL SAFETY RESOURCE CENTER,
LLC, CHRISTOPHER STREB, and DTE
ENERGY COMPANY,
                        Defendants.

SHAREEF EL-JAMALY,

        Plaintiff-Appellant,

v                                    No. 164903

KIRCO MANIX CONSTRUCTION, LLC,
KIRCO DEVELOPMENT, LLC, and
OERLIKON METCO (US) INC.,

        Defendants-Appellees,

and

KIRCO-OM PLYMOUTH, LLC, GHAFARI
ASSOCIATES, LLC, GHAFARI, INC.,
NATIONAL SAFETY RESOURCE CENTER,
LLC, CHRISTOPHER STREB, DTE ENERGY
COMPANY, and DTE ELECTRIC
COMPANY,

        Defendants.

---

SHAREEF EL-JAMALY,

        Plaintiff-Appellant,

v                                    No. 164904

KIRCO MANIX CONSTRUCTION, LLC, and
KIRCO DEVELOPMENT, LLC,

        Defendants-Appellees,

and

2

KIRCO-OM PLYMOUTH, LLC, OERLIKON METCO (US) INC., GHAFARI ASSOCIATES, LLC, GHAFARI, INC., NATIONAL SAFETY RESOURCE CENTER, LLC, CHRISTOPHER STREB, DTE ENERGY COMPANY, and DTE ELECTRIC COMPANY,

Defendants.

_____

BEFORE THE ENTIRE BENCH

WELCH, J.

Plaintiff Shareef El-Jamaly was electrocuted when a metal tool that he was carrying either touched or almost touched a high-voltage power line at the construction site where he was working. Plaintiff filed this lawsuit, claiming that Kirco Manix Construction, LLC (Kirco), the general contractor on the project, and DTE Energy Company (DTE), the owner of the power line, were negligent. We hold that plaintiff has presented enough evidence to survive summary disposition as to Kirco and DTE based upon, respectively, the "common work area" doctrine and a question of fact that remains as to DTE's knowledge of the height of the power line.

## I. FACTUAL HISTORY

On November 13, 2017, plaintiff was working on a construction site where Kirco was overseeing the construction of a building owned by Kirco-OM Plymouth, LLC, and leased by Oerlikon Metco (US) Inc. Plaintiff was an employee of the concrete subcontractor, Merlo Construction Company, Inc. (Merlo). At the end of the workday, plaintiff was tasked with retrieving, cleaning, and returning to the truck a set of "bull floats" that had been used earlier in the day to smooth concrete on the job site. A bull float is a

3

long-handled tool made up of four connected aluminum segments, each roughly 6-feet long. A fully connected bull float is approximately $23^{1}/_{2}$-feet long.

When plaintiff picked up one of the bull floats[1] to carry it back to the truck to be disassembled and stored, the end of the bull float either made contact with or came in close proximity to the DTE 40 kV power line above him. Plaintiff was electrocuted and sustained severe injuries that resulted in the amputation of his right arm above the elbow and the amputation of his left leg below the knee. Plaintiff also suffered a traumatic brain injury when he fell after being electrocuted. None of the individuals who were at the scene witnessed the incident, and plaintiff has no memory of the incident.

The height of the power line at the time of the incident is in dispute. DTE's forensic team measured the height of the power line where plaintiff was injured at 23 feet 4 inches. However, another DTE employee who examined the power line estimated that the clearance for the line was about 20 feet with a "belly" or "sag" of about 3 feet, meaning that at its lowest point, the line might have been only 16 or 17 feet off the ground.[2]

---

[1] Defendants' electrical engineer expert suggested that the incident happened when plaintiff was carrying the bull float vertically from the work site to the Merlo truck. Plaintiff's electrical engineer expert indicated that the incident occurred as plaintiff was picking up the bull float with the intention of carrying it horizontally over his shoulder. Regardless, the parties agree that the incident happened while plaintiff was handling the bull float in such a way that it either touched or came into close contact with the power lines.

[2] The National Electrical Safety Code (NESC) sets a minimum clearance standard for the height of power lines of 18 feet 7 inches, which is measured at the lowest point of the line.

4

A. COMMUNICATIONS WITH DTE ABOUT POWER LINES BEFORE
PLAINTIFF'S INJURY

Michael Moore, Kirco's vice president in charge of construction, had concerns about the power lines before construction began. He testified in his deposition that the DTE power lines were a safety concern because the wires were positioned close to the building where construction would take place, carried extremely high voltage, and appeared to be unusually low. Because of concern over the potential danger that these power lines would present during the construction project, employees of Kirco and Oerlikon engaged in multiple discussions with DTE personnel about insulating the power lines or otherwise protecting workers from the dangers presented by these lines during the construction process. DTE assigned David Fontanive as its "Principal Account Manager" for the power lines that serviced the property after discussing the construction project with Oerlikon. Fontanive first met with Oerlikon in September 2016, several months before construction on the project began in May 2017.

At the time the property was purchased, the parcel was heavily wooded. Therefore, the first phase of construction was commenced by Carnwath Excavating Company (Carnwath) to remove trees from the property and complete a mass grading. Carnwath subcontracted the tree removal portion of the job to another company, Lang Land Clearing. Before Lang Land Clearing began its work, Duane Allison, Kirco's project manager, exchanged e-mails with an employee of Carnwath, Mark Vance, on March 20, 2017, inquiring about the potential danger of the tree removal work given its close proximity to the DTE power lines. In his e-mail, Allison asked Vance if there was sufficient clearance for the tree removal. Allison further advised, "[I]f required we can request DTE to cover

5

the lines." Vance responded on the same day that "DTE should be contacted to insulate the lines for ourselves and other trades that would have boom type equipment." Vance further wrote, "It would be in all of our best interests to have the lines insulated for the duration of the project." Fontanive, as DTE's representative, was copied on that e-mail.

Fontanive e-mailed Allison the next morning, agreeing that the lines should be covered during the construction process. Fontanive wrote: "Sounds like [tree removal subcontractor] Bill Lang should call and get the line protection." The next day, March 22, 2017, Fontanive sent another e-mail to Allison, following up on an earlier telephone conversation. During that telephone conversation, according to Allison, Allison told Fontanive that Kirco would like to have the 40 kV wires running through the property covered and that Kirco would pay all of the costs associated with covering the lines. Allison later testified in his deposition that, during these conversations with Fontanive, he also suggested other steps that DTE could take to protect workers from the dangers posed by the lines, including having DTE raise, de-energize, relocate, or bury the high-voltage lines.[3]

According to Allison, DTE's Fontanive told him that the lines could not be de-energized, relocated, or buried, but Fontanive was in agreement with Allison's proposal

---

[3] There are factual disputes concerning this aspect of Allison's deposition testimony. DTE's employees, while acknowledging that Allison did make a request that DTE cover the lines during the construction process, have disputed or do not recall whether he also asked DTE to explore the possibility of other safety measures being taken. Nicholas Ditomaso, an employee of Kirco, testified as to these additional potential measures. In a deposition that he later provided in this case, Allison testified that he wanted the entirety of the high-voltage lines covered and that he wanted the lines covered from the beginning of the construction process to its completion.

that the lines should be covered. In another March 22, 2017 e-mail, Fontanive affirmed to Allison, "[Y]ou will need the line protection when construction begins some time in May." In the same e-mail, Fontanive further stated that Oerlikon, Kirco, and DTE should have a joint site meeting to discuss covering the lines.

That meeting took place on April 19, 2017. There were four representatives of DTE present on site for the meeting, including Fontanive and Colleen Knight from DTE's Planning Department. At this meeting, Allison allegedly proposed alternative steps to protect construction workers from the high-voltage wires. These alternatives included raising the wires, de-energizing them, burying them, or rerouting them. The following morning, Knight sent an e-mail to Allison informing him she had talked to a DTE overhead line supervisor "about adding protection to the 40KV lines and he said that it can not [sic] be done."

### B. PRIOR CONTACT WITH POWER LINES, SAFETY EFFORTS, AND WARNINGS

Between the time of the on-site meeting on April 19, 2017, and Knight's e-mail to Allison the following morning, a Carnwath employee severed one of the 40 kV power lines when the boom of an excavator came into contact with the lines. The employee was unharmed. DTE was immediately notified, and it repaired the line. Although Kirco's Safety Manual requires a prompt investigation when one of its subcontractors is involved in an accident that has the potential for serious injury, no investigation was conducted.

On the day following the Carnwath incident, Allison sent two e-mails. The first e-mail, sent to employees of both Carnwath and Kirco, stated, "[W]e must keep the required clearance at all times," and he ordered "additional signage out." In the second e-mail, sent

7

to the same recipients on the same day, Allison indicated that because DTE could not cover the lines, "any work in that area needs to be discussed and covered in pre-task planning form each morning." At his deposition, Allison agreed that he had ordered extra signage and daily pre-task meetings because he "knew that other trades would be on the site working in [the] same location [where the Carnwath incident occurred] as the project progressed . . . ."

As part of its overall safety efforts, Kirco held mandatory safety-orientation meetings with the employees of every subcontractor, placed posters on the Kirco trailers where the safety-orientation meetings were held, provided notice of the power lines and of a requirement of the Michigan Occupational Safety and Health Administration (MIOSHA) to maintain a 10-foot distance from the lines, placed warning signs around the job site regarding the power lines, provided a Kirco safety manual to every employee of every subcontractor, and entered into a contract to give employees safe tools.

### C. MERLO'S WORK ON THE PROJECT

Merlo, the concrete subcontractor hired by Kirco, first sent a crew to the project site in July 2017. Allison did not discuss the power lines that extended over the property during his meeting with the Merlo supervisors at that time, and he did not discuss any safety hazards presented by the lines. Allison also did not discuss whether any tools the Merlo workers might be using were made of nonconductive material.

On November 13, 2017, Merlo began pouring concrete on the work site, which required the team to work in close proximity to the high-voltage wires. Nobody from Kirco conducted a pre-task safety planning meeting that day with the members of the Merlo crew

8

to discuss power line safety or checked to see that only nonconductive tools were being used in that location.

When moving their equipment from their truck to the job site, the Merlo crew had to pass under DTE's 40 kV power lines. While Kirco had previously placed a large sign warning of the danger presented by the power lines near the area where plaintiff was ultimately injured, the sign blew down the week before the incident. No one reposted the sign. As previously noted, plaintiff was severely injured when his bull float either hit or came close to hitting the power lines.

As a result of the November 13 incident, Kirco was fined $8,400 by MIOSHA for (1) permitting workers with conductive bull floats in an area close to an energized power line, (2) not reinstalling the "DANGER" sign after it was blown over, and (3) not installing a "DANGER" sign that satisfied MIOSHA requirements.

## II. PROCEDURAL HISTORY

In September 2018, plaintiff filed a lawsuit alleging negligence and premises liability claims against multiple defendants, including the defendants at issue here: Kirco (the general contractor) and DTE (the utility company that owned, controlled, and maintained the overhead power lines on the property).[4] Plaintiff argued that Kirco was liable for the negligence of its subcontractors under the common work area doctrine. With

---

[4] Plaintiff also sued Oerlikon, the lessor of the property under construction, and the National Safety Resource Center, LLC, and its principal, Christopher Streb, who were safety consultants for plaintiff's employer, Merlo. While the trial court denied summary disposition as to all the defendants, the Court of Appeals reversed. We only granted argument as to the issues involving Kirco and DTE, and thus, the decision of the Court of Appeals regarding the other defendants remains in place, and leave to appeal is denied in all other respects. See *El-Jamaly v Kirco Manix Constr, LLC*, 511 Mich 909 (2023).

regard to DTE, plaintiff asserted that DTE was negligent because months before plaintiff suffered his injuries, DTE was aware of the dangers that its high-voltage lines presented to construction subcontractors and was specifically asked to take steps to remediate that danger but failed to do so. Each defendant moved for summary disposition. The circuit court denied the motions.

On September 1, 2022, the Court of Appeals reversed the circuit court's rulings and held that each of the defendants was entitled to summary disposition. With regard to Kirco, the Court of Appeals ruled that plaintiff failed to satisfy the requirements of the common work area doctrine. Specifically, the panel defined the pertinent danger under the common work area doctrine as "the risk of electrocution from use near the power line of high-reaching conductive tools or equipment capable of reaching the power lines." *El-Jamaly v Kirco Manix Constr, LLC*, unpublished per curiam opinion of the Court of Appeals, issued September 1, 2022 (Docket Nos. 355402, 355703, 355932, and 356542), p 14. It then determined that only plaintiff and perhaps one other Merlo employee were exposed to this risk, which was not enough to constitute "a significant number of workers" under the common work area doctrine. *Id*. at 15, citing *Alderman v JC Dev Communities, Inc*, 486 Mich 906, 906 (2010) (holding that exposing "two to six employees of one subcontractor" to the risk of electrocution was not enough to meet the third element of the common work area doctrine). It also determined that under the first element of the common work area analysis, Kirco had taken reasonable steps to protect against danger at the job site.

Regarding DTE, the Court of Appeals ruled that it did not owe a duty to plaintiff, in large part because the Court believed the evidence definitively showed that the power lines near the site of the incident were not defective. See *Groncki v Detroit Edison Co*, 453

10

Mich 644, 657-658; 557 NW2d 289 (1996) (opinion by BRICKLEY, C.J.) (rejecting negligence claims against a utility company where the power lines were not alleged to be defective); *Schultz v Consumers Power Co*, 443 Mich 445, 453-454; 506 NW2d 175 (1993) (allowing negligence claims against a utility company where the power lines were uninsulated and frayed). Plaintiff sought leave to appeal in this Court, and we ordered oral argument on the application, directing the parties to address

> whether the Court of Appeals erred in holding that: (1) the defendant Kirco Manix Construction, LLC cannot be held liable under the common work area doctrine; and (2) the defendant DTE Electric Company did not owe a duty to the plaintiff. [*El-Jamaly v Kirco Manix Constr, LLC*, 511 Mich 909, 909-910 (2023).]

We now address these issues.

## III. STANDARD OF REVIEW

"This Court reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law." *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999).

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions, and other evidence submitted by the parties, MCR 2.116(G)(5), in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law. [*Id*. at 120.]

A reviewing court "should evaluate a motion for summary disposition under MCR 2.116(C)(10) by considering the substantively admissible evidence actually proffered in opposition to the motion. A reviewing court may not employ a standard citing the mere possibility that the claim might be supported by evidence produced at trial." *Id*. at 121.

11

## IV. KIRCO AND THE COMMON WORK AREA DOCTRINE

## A. LEGAL BACKGROUND

This Court has held that general contractors are, ordinarily, not liable for the negligence of their subcontractors or their subcontractors' employees unless a plaintiff can establish a claim under the common work area doctrine. See *Funk v Gen Motors Corp*, 392 Mich 91, 101-102, 104; 220 NW2d 641 (1974). As this Court explained in *Funk*, " '[A]s a practical matter in many cases only the general contractor is in a position to coordinate work or provide expensive safety features that protect employees of many or all of the subcontractors. . . . [I]t must be recognized that even if subcontractors and supervisory employees are aware of safety violations they often are unable to rectify the situation themselves and are in too poor an economic position to compel their superiors to do so.' " *Id*. at 104, quoting *Alber v Owens*, 66 Cal 2d 790, 796; 427 P2d 781 (1967) (alterations in *Funk*). The court then set forth the requirements for establishing a claim under the common work area doctrine:

> We regard it to be part of the business of a general contractor to assure that reasonable steps within its supervisory and coordinating authority are taken to guard against readily observable, avoidable dangers in common work areas which create a high degree of risk to a significant number of workmen. [*Funk*, 392 Mich at 104.]

In *Funk*, the plaintiff was working on a construction project at a General Motors (GM) plant. *Id*. at 99. The general contractor for the project, Darin & Armstrong (Darin), subcontracted with the plaintiff's employer. *Id*. The plaintiff sued GM and Darin after falling off an elevated platform, claiming that both companies had failed to take reasonable safety precautions and had failed to ensure that workers on the project used adequate fall protection equipment. *Id*. at 100.

The Court concluded that the general contractor, Darin, possessed full knowledge of the subcontractor's failure to implement reasonable safety precautions for a readily apparent danger where such precautions likely would have prevented the plaintiff's fall. *Id*. at 102-104. Additionally, the Court determined that GM, who hired Darin for the project, had "exercised an unusually high degree of control over the construction project" and thus was also liable for the plaintiff's injuries. *Id*. at 105.

This Court reaffirmed the common work area doctrine in *Ormsby v Capital Welding, Inc*, 471 Mich 45, 54; 684 NW2d 320 (2004). In that case, the general contractor, Monarch Building Services, Inc., subcontracted with Capital Welding, Inc., for welding work on a Rite Aid store. *Id*. at 49-50. Capital Welding, in turn, subcontracted the steel-erection work. *Id*. at 50. The plaintiff in *Ormsby*, who was a journeyman ironworker employed by the steel-erection subcontractor, fell while working on the job site and was severely injured. *Id*.

The plaintiff filed suit against Capital Welding and Monarch, alleging that both companies had retained control of the project, negligently supervised the project, and acquiesced to unsafe construction activities. *Id*. Both defendants moved for summary disposition, arguing that there was no genuine issue of material fact regarding whether they retained control over the project because the plaintiff failed to present any evidence that he was injured in a common work area. *Id*. at 51. The trial court found that the plaintiff failed to satisfy all the elements of the common work area doctrine and granted the motions of both defendants. *Id*. at 51-52.

The Court of Appeals reversed in part, holding that evidence that "employees of other subcontractors would be or had been working in the same area where plaintiff's injury

13

occurred . . . create[d] a genuine issue of material fact regarding whether plaintiff's injury occurred in a common work area." *Id*. at 52 (quotation marks and citation omitted; alteration in original). Defendants appealed to this Court. We held that the common work area doctrine could not apply to Capital Welding because it was not the general contractor. *Id*. at 58. But because Monarch was the general contractor, the common work area doctrine was applicable. See *id*.

This Court then analyzed the plaintiff's claims against Monarch. It noted that the trial court had concluded that the plaintiff had failed to satisfy element three of the common work area doctrine (a danger creating a high degree of risk to a significant number of workers) and element four (a common work area). *Id*. at 58-59. The Court stated "that a plaintiff's failure to satisfy *any* one of the four elements of the 'common work area doctrine' is fatal to a *Funk* claim." *Id*. at 59. The Court therefore reversed the judgment of the Court of Appeals and reinstated the trial court's order granting summary disposition for Capital. *Id*. at 59-60.

In *Latham v Barton Malow Co*, 480 Mich 105, 108; 746 NW2d 868 (2008), the plaintiff was employed on a construction site where a school was being built. On the day of the accident, the plaintiff and a coworker were moving sheets of drywall from a lift onto an elevated level of the building. *Id*. There was a rule on the work site that workers use fall protection harnesses, but the plaintiff was not wearing one. *Id*. A sheet of drywall cracked, and the plaintiff fell and suffered injuries. *Id*. The plaintiff filed a lawsuit against Barton Malow Company, the construction manager on the project. *Id*. at 108-109. While the plaintiff's claims survived summary disposition in the trial court and the Court of

14

Appeals, this Court reversed the judgment of the Court of Appeals and remanded to the trial court. *Id*. at 115.

The central issue in *Latham* was how to frame the danger presented in order to apply the common work area doctrine. *Id*. at 113. While the lower courts had defined the applicable danger more generally as "working at heights," this Court defined the applicable danger as "*working at heights without fall-protection equipment*." *Id*. at 114. The Court reasoned that

> the rationale behind the *Funk* doctrine is that the law should be such as to discourage those in control of the worksite from ignoring or being careless about unsafe working conditions resulting from the negligence of subcontractors or the subcontractors' employees. [*Id*. at 112.]

The Court noted that in *Funk*, the applicable danger was defined as "working at heights without fall-protection equipment." See *id*. at 113-114. The *Latham* Court concluded that just "working at heights" alone could not be the applicable danger because doing so would essentially create strict liability for general contractors when undertaking projects requiring work at elevated heights. *Id*.

### B. ANALYSIS

In order to demonstrate that the common work area doctrine applies to his claim, plaintiff must establish: "(1) the defendant, either the property owner or general contractor, failed to take reasonable steps within its supervisory and coordinating authority (2) to guard against readily observable and avoidable dangers (3) that created a high degree of risk to a significant number of workmen (4) in a common work area." *Ormsby*, 471 Mich at 54.

As an initial matter, in analyzing whether plaintiff satisfied the common work area doctrine, this Court must address the definition of the risk of harm that plaintiff faced on

15

the job site. In this case, the Court of Appeals defined the risk of harm as "the risk of electrocution from use near the power line of high-reaching conductive tools or equipment capable of reaching the power lines." *El-Jamaly*, unpub op at 14. The Court of Appeals relied on *Alderman*, 486 Mich at 906, in which this Court defined the risk of harm for purposes of the common work area doctrine analysis as follows:

> The Court of Appeals erred by holding that the common-work-area doctrine applies to this case. The risk of injury at issue here was the risk of electrocution from a subcontractor's crane coming into contact with power lines above the construction site. The only employees exposed to the risk of electrocution were two to six employees of one subcontractor, including the plaintiff, and therefore there was not a high degree of risk to a significant number of workers.

Thus, the Court of Appeals defined the risk of harm, like this Court had in *Alderman*, as the risk of electrocution. While the Court of Appeals properly defined the risk of harm, it failed to recognize that there remain genuine issues of material fact by which plaintiff could satisfy the common work area doctrine.

### 1. ELEMENTS 1 AND 2: DEFENDANT GENERAL CONTRACTOR FAILED TO TAKE REASONABLE STEPS WITHIN ITS SUPERVISORY AND COORDINATING AUTHORITY TO GUARD AGAINST READILY OBSERVABLE AND AVOIDABLE DANGERS

With respect to the first element of the common work area doctrine, there is no dispute that Kirco was the general contractor on the job site where plaintiff was working and injured. When addressing the first and second elements of the common work area doctrine—whether Kirco took reasonable steps within its supervisory or coordinating authority to guard against readily observable and avoidable dangers—the Court of Appeals held that Kirco only had "to take *reasonable* steps to address the danger; the fact that more

16

could have been done when viewed in hindsight does not alter the fact that Kirco Manix took reasonable steps." *El-Jamaly*, unpub op at 15-16. It also found that "the power line involved in plaintiff's accident was at a proper height and in good repair." But the record is not at all clear, contrary to the Court of Appeals' holding, that the power lines were at a "proper height." *Id*. at 14.

As previously noted, DTE's forensic team measured the height of the power line where plaintiff was injured at 23 feet 4 inches, while another DTE employee who examined the line estimated that the clearance of the lines was about 20 feet with a "belly" or "sag" in the wire of about 3 feet, meaning that at its lowest point, the line may have only been 16 or 17 feet off the ground. The NESC sets the minimum clearance standard for the height of power lines at 18 feet 7 inches, which is measured at the lowest point of the line. This factual discrepancy is significant when analyzing whether Kirco's actions were reasonable.[5]

Further, the record is not conclusive that Kirco took *reasonable* steps within its supervisory authority to guard against the power line danger. As noted, Kirco did take many safety steps with respect to managing the job site, including distributing a safety manual, posting warnings, and holding safety meetings. But there are questions of fact as to the *reasonableness* of Kirco's actions. For example, regarding the safety manual, it is unclear how or if power lines were addressed in the manual. And while holding safety

---

[5] Notably, even if the NESC standard were followed, a duty could still exist to ensure the safety of workers. See *Schultz*, 443 Mich at 456 (stating that although compliance with the NESC standard is "evidence of due care, conformity with industry standards is not conclusive on the question of negligence where a reasonable person engaged in the industry would have taken additional precautions under the circumstances").

17

meetings is one consideration in determining the reasonableness of safety efforts, whether such a measure is sufficient would depend on the timing of the meetings, the frequency of the meetings, who attended the meetings, and the quality and effectiveness of the information disseminated in those meetings.

In this case, we know that a safety meeting did not occur on the morning of the incident, and plaintiff himself never attended a safety meeting, despite the fact that daily pre-task meetings were otherwise part of Kirco's plan. And while signs and postings warning of danger may constitute reasonable measures, the warning sign at the job site blew down and was not replaced before plaintiff was injured the following week. Further, plaintiff here was using a metal bull float—contrary to the industry standard of using non-conductive tools—which raises questions about the general contractor's agreement to provide safe tools to workers on the job site.

Ultimately, the reasonableness of Kirco's actions in guarding against the danger in this case is an analysis reserved for a jury because of the unresolved factual questions. We agree with the dissent that the record is voluminous and that there are facts that can be argued as favoring each party in this matter. But these very factual questions underscore plaintiff's success—not failure—in establishing a genuine issue of material fact as to whether Kirco failed to take reasonable steps within its supervisory and coordinating authority to guard against readily observable and avoidable dangers. And factual disputes are resolved in favor of the nonmovant for purposes of summary disposition. Accordingly, the Court of Appeals erred when it held that defendants were entitled to summary disposition given that fact issues remain as to the first and second elements of the common work area doctrine.

## 2. ELEMENT 3: HIGH DEGREE OF RISK TO A SIGNIFICANT NUMBER OF WORKERS

The third factor examined under the common work area doctrine is whether there was a high degree of risk posed to a significant number of workers. As noted, the Court of Appeals relied on *Alderman*, 486 Mich at 906, which held that "two to six employees of one subcontractor" was not enough to meet the third element of the common work area doctrine. In short, the Court of Appeals concluded that only plaintiff and perhaps another Merlo employee were imperiled by the pertinent danger. But this misses the mark.

The Court of Appeals ignored the extensive record regarding the risk of electrocution presented to the other building trades on the job site. For example, when asked which construction trades worked in proximity to the power line that electrocuted plaintiff, Kirco's project manager, Allison, responded, "Electrical, mason, the window company, the siding company, and the roofer. . . . And the cement contractors." Allison also testified there were cranes, lifts, and scissor lifts capable of reaching the line used throughout the project. Indeed, Allison affirmed that he "*knew* that other trades would be on the site working in [the] same location as the project progressed . . . ." (Emphasis added.) In other words, Merlo was not the only subcontractor at risk. Contrary to the dissent's assertion that, at most, two subcontractors were at risk, many other subcontractors were also exposed to this risk.

Further, the Court of Appeals completely explained away the Carnwath incident, which involved the tree removal subcontractor who severed the power lines after the boom from an excavator came into contact with the lines. The Court of Appeals held that the "incident occurred seven months earlier under a different span of power lines on a different part of the property, the worker was not injured, and there is no evidence that conductive

19

tools or equipment were used by Carnwath." *El-Jamaly*, unpub op at 15. In effect, the Court of Appeals added two new requirements to the common work area doctrine—a temporal limitation and a prior injury requirement. We reject both.

There is no temporal limitation under the common work area doctrine as to when a general contractor for the same work site on the same project can be put on notice of a danger.[6] See *Funk*, 392 Mich at 103 (noting that the danger persisted over *months* while people worked at elevation without fall protection); *Erickson v Pure Oil Corp*, 72 Mich App 330, 337; 249 NW2d 411 (1976) ("All that is required is that two or more subcontractors will eventually work in the same area of the construction site."); *Candelaria v B C Gen Contractors, Inc*, 236 Mich App 67, 75; 600 NW2d 348 (1999) ("In order to have a 'common work area,' there need not be multiple subcontractors working on the same site at the same time. All that is required is that the employees of two or more subcontractors eventually work in the same area.").

---

[6] See *Richter v American Aggregates Corp*, 522 F Appx 253, 263 (CA 6, 2013):

> Of course, discerning the relevant time period need not involve a binary choice—during, or after, construction. Rather, it follows from *Ormsby* and its predecessors that the relevant time is the time period during which the hazardous activity is occurring or will occur—whether it lasts one hour, one day, or for the duration of a particular construction stage. See [*Smith v BREA Prop Mgt of Mich LLC*, 490 F Appx 682, 686 (CA 6, 2012)] (measuring the number of contractors on site "[a]t the time of the hazardous activity"). The length of the relevant time period is defined by the continued existence of the same risk of harm in the same area.

Nor is there a requirement that someone first be injured or electrocuted.[7] The pertinent danger in this case is "the risk of electrocution from use near the power line of high-reaching conductive tools or equipment capable of reaching the power lines." *El-Jamaly*, unpub op at 14. Negligence is rooted in foreseeability. While no one was electrocuted in the Carnwath incident, the incident still could demonstrate that the line was too low and that a future worker could hit it and be electrocuted.[8] To add a "prior injury" requirement to the common work area danger analysis would mean that a risk is never foreseeable unless an injury has actually occurred. That would make a subsequent accident not just "foreseeable," but *actually foreseen*. That is not the test.

And finally, there are disputed fact issues regarding the Carnwath incident. While the Court of Appeals stated that the incident occurred on a different span of the power lines, plaintiff disputes that assertion. Plaintiff claims that the Carnwath incident "involved the same set of wires that caused Mr. El-Jamaly's accident and the point where the Carnwath operator made contact with the wires was only yards away from the location of Mr. El-Jamaly's accident[,] not on a 'different part of the property.' " At bottom, this shows a genuine issue of material fact regarding the hazard. Such factual discrepancies are decided

---

[7] In arguing that plaintiff failed to meet his burden of showing that a significant number of workers employed by other subcontractors were at risk of electrocution from the use of conductive tools capable of reaching the power lines, Kirco notes there was no evidence that Carnwath was using conductive equipment when its employee severed a power line. Further, Kirco notes that the Carnwath employee was not injured when the excavator severed the power line. However, there is uncertainty as to whether the power line was active at the time it was severed. Therefore, the link that Kirco attempts to create between the nonconductivity of the excavator used by the Carnwath employee and a lack of a risk of harm to other subcontractors is not readily apparent.

[8] In fact, Kirco posted a "danger" sign after the incident.

21

in favor of the nonmovant, rendering the Court of Appeals' grant of summary disposition to defendants on this issue premature.

### 3. ELEMENT 4: COMMON WORK AREA

With regard to the fourth and final element required to establish a common work area claim, the Court of Appeals found that plaintiff could not establish that the incident occurred in a common work area. In support, the Court of Appeals reasoned that "[b]ecause plaintiff did not establish that employees of a number of subcontractors were subject to the same risk or hazard, he failed to establish that the alleged danger existed in a common work area." *Id*. at 15. The Court of Appeals asserted that there was no evidence that "any subcontractors other than Merlo were using high-reaching conductive tools or equipment capable of reaching the overhead power lines." *Id*. But, as noted above, this is incorrect.

While the dissent claims that "the power lines were not located in a common work area among the subcontractors," the evidence established that multiple workers had to pass under the power lines in order to perform work at the job site.[9] If the area beneath or around power lines is a space where employees from multiple subcontractors work or are expected to work, that area could be considered a common work area by the finder of fact. This would especially be the case if the presence of the power lines creates a significant risk that needs to be managed by the entity with supervisory control. Moreover, in cases

---

[9] A common work area, for the purposes of the common work area doctrine, is characterized by a space where "employees of two or more subcontractors *will eventually work*," *even if not simultaneously*. See *Groncki*, 453 Mich at 663 (opinion by BRICKLEY, C.J.) (emphasis added).

involving power lines and safety, courts have focused on the duty of entities to anticipate ordinary use of the area around the lines and to safeguard against risks, such as in *Schultz v Consumers Power Co*. This aligns with the requirement under the common work area doctrine that the defendant must take reasonable steps within its supervisory authority to guard against dangers in areas where there is a high degree of risk to a significant number of workers.

There were multiple subcontractors using equipment that could reach the high-voltage wires, including the operator employed by Carnwath, who in April 2017 allegedly severed the same lines that later caused plaintiff's injury.[10] At a minimum, a genuine issue of material fact exists regarding whether the injury occurred in a common work area, especially when viewed in the light most favorable to the nonmovant, plaintiff.

In summary, plaintiff has set forth facts that survive summary disposition as to his common work area claim against Kirco. We therefore reverse the judgment of the Court of Appeals as to the claims against Kirco.

## V. NEGLIGENCE AND DTE

### A. LEGAL BACKGROUND

In order to determine if an electrical utility should be held responsible for an injury due to contact with electrical wires, we examine the usual rules for negligence. To establish a negligence cause of action, a plaintiff must prove that the defendant owed a legal duty to

---

[10] As outlined above, the parties agree that the power lines were severed on the job site by a Carnwath employee. But it is disputed in the record whether this occurred in the same location as the incident in which plaintiff was injured and whether the lack of injury was the result of nonconductive tools or equipment.

the plaintiff, that the defendant breached or violated that duty, that the plaintiff suffered damages, and that the breach was a proximate cause of the damages suffered. *Schultz*, 443 Mich at 449. "[T]he question whether the defendant owes an actionable legal duty to the plaintiff is one of law . . . ." *In re Certified Question from the Fourteenth Dist Court of Appeals of Texas*, 479 Mich 498, 504-505; 740 NW2d 206 (2007) (quotation marks and citation omitted).

"Duty is the legal obligation to conform one's conduct to a particular standard to avoid subjecting others to an unreasonable risk of harm." *Composto v Albrecht*, 328 Mich App 496, 499; 938 NW2d 755 (2019). A duty of care may arise by statute, by a contractual relationship, or under the common law. *Hill*, 492 Mich at 660-661. "[B]efore a duty can be imposed, there must be a relationship between the parties and the harm must have been foreseeable." *Hill v Sears, Roebuck & Co*, 492 Mich 651, 661; 822 NW2d 190 (2012).

As relevant here, we have held that "a company that maintains and employs energized power lines must exercise reasonable care to reduce potential hazards as far as practicable." *Schultz*, 443 Mich at 451. Specifically, we recognized that "a power company has an obligation to reasonably inspect and repair wires and other instrumentalities in order to discover and remedy hazards and defects." *Id*. This "obligation extends to persons within the foreseeable scope of the risk." *Moning v Alfono*, 400 Mich 425, 439; 254 NW2d 759 (1977).[11] Further clarifying this point, we held:

---

[11] The applicable foreseeability analysis under the elements of duty and proximate causation is a source of common confusion. To clarify the distinction, we have stated:

> The questions of duty and proximate cause are interrelated because the question whether there is the requisite relationship, giving rise to a duty, and

Those engaged in transmitting electricity are bound to anticipate ordinary use of the area surrounding the lines and to appropriately safeguard the attendant risks. The test to determine whether a duty was owed is not whether the company should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable activity done on the premises for business, work, or pleasure. [*Schultz*, 443 Mich at 452-453.]

We further stated, "The degree of care required is that used by prudent persons in the industry, under like conditions and proportionate to the dangers involved, to guard against reasonably foreseeable or anticipated contingencies." *Id*. at 454.

Applying these principles in *Schultz*, we held that the electric utility company owed a duty to the decedent, who was electrocuted while helping a friend paint the exterior of his home. *Id*. at 447. The decedent was using a 27-foot aluminum extension ladder when electricity allegedly arced from an uninsulated and frayed wire located near the home, electrocuting him. *Id*. at 448. We reasoned:

[The electric utility company] should have realized that homeowners generally maintain their homes. This may include washing windows, cleaning troughs, repairing the roof, cleaning gutters, and, certainly, painting. Considering the proximity of the uninsulated primary wire to the house (roughly fifteen horizontal feet and twenty-four vertical feet from the ground), it was foreseeable that someone making repairs could be injured by a dilapidated wire. [*Id*. at 452-453.]

Following our decision in *Schultz*, we have examined the question of the legal duty owed by electric utility companies in two other cases.

---

the question whether the cause is so significant and important to be regarded a proximate cause both depend in part on foreseeability—whether it is foreseeable that the actor' conduct may create a risk of harm to the victim, and whether the result of that conduct and intervening causes were foreseeable. [*Moning*, 400 Mich at 439.]

In *Groncki*, 453 Mich 644, the plaintiff, a maintenance supervisor at a condominium complex, was electrocuted and suffered severe injuries after he used an aluminum ladder to access the roof of the condominium near the power lines. *Id*. at 651 (opinion by BRICKLEY, C.J.). The plaintiff filed a lawsuit against the power company. See *id*. The lead opinion concluded that the plaintiff's injuries were not foreseeable and distinguished *Schultz* on the basis that the power lines in *Groncki* were not defective and that the plaintiff was an experienced workman fully aware of the presence of the wires.

Lastly, in *Valcaniant v Detroit Edison Co*, 470 Mich 82, 83-84; 679 NW2d 689 (2004), the Court determined that the plaintiff's injuries were not foreseeable, and thus, the defendant did not owe a legal duty to the plaintiff. The plaintiff, who owned a gravel lot, was injured when a dump truck on the lot severed a nearby overhead power line owned by the defendant. *Id*. at 84. The defendant's sensor detected the severed line and stopped the flow of electricity, but the sensor was designed to restart the flow of electrical current three times within a 6-second period to determine if a defect existed. *Id*. The plaintiff was injured by the sensor completing its cycles. *Id*. at 84-85. The plaintiff filed suit, arguing that the defendant owed him a legal duty to de-energize the severed power line immediately. *Id*. at 85. The trial court denied the defendant's motion for summary disposition, but the Court of Appeals reversed, holding that the defendant owed no legal duty to the plaintiff. *Id*. This Court affirmed and remanded to the trial court for entry of summary disposition in favor of the defendant. *Id*. at 83-84, 88. The Court reasoned:

> Edison had no obligation to anticipate that the dump truck operated under plaintiff's direction would sever an overhead power line that was suspended more than twenty-five feet above the ground, much less that plaintiff would be standing on wet ground several feet away. As a result, Edison had no legal duty to anticipate that plaintiff might be injured when

26

the sensor device briefly re-energized the line, as it was designed to do, or to take other steps to prevent plaintiff's injury. [*Id*. at 87-88.]

## B. ANALYSIS

In the instant case, the issue of whether DTE owed plaintiff a duty rests upon whether contact with the power lines by high-reaching conductive equipment was foreseeable. The Court of Appeals determined that DTE should have been granted summary disposition on the basis that plaintiff's lifting of the bull float and carrying it vertically was not foreseeable. *El-Jamaly*, unpub op at 11-12. Again, we disagree. There are genuine issues of material fact regarding the height of the power lines. And, as explained in more detail in this opinion, if the power lines were improperly maintained, then the height of the lines coupled with the pre-injury communications and other evidence in the record demonstrates that plaintiff's injury was foreseeable.

First, the parties dispute whether the power lines were hanging at a safe height. DTE argues that the electrical lines were properly maintained, citing its forensic team, which measured the height of the power lines at 23 feet 4 inches the day after the incident. By contrast, plaintiff contends that the lines were only 16 to 17 feet above the ground—below the NESC-standard clearance height of 18 feet 7 inches. In support, plaintiff relies on the deposition testimony of a DTE supervisor who examined the lines and estimated that, at their lowest point, the wires might be only 16 or 17 feet off the ground. In sum, the height of the electrical lines—which is a disputed factual question—is relevant to the determination whether they were properly maintained, and hence, whether the incident was foreseeable by DTE. The Court of Appeals erroneously decided the power lines were properly maintained when the record indicates a clear dispute on this fact. Disputed facts,

even when related to duty, must be resolved by the jury. See *Smith v Allendale Mut Ins Co*, 410 Mich 685, 768; 303 NW2d 702 (1981) (BLAIR MOODY, JR., J., dissenting) ("[O]ften the imposition of a duty in the first instance depends on factual circumstances establishing the conduct or relationship of the parties involved. The existence or nonexistence of such facts, as well as the resolution of disputed inferences therefrom, are clearly questions for the jury's determination."). See *Schultz*, 443 Mich at 450, citing *Buczkowski v McKay*, 441 Mich 96, 100; 490 NW2d 330 (1992) ("In determining whether a duty exists, courts examine a wide variety of factors, including the relationship of the parties and the foreseeability and nature of the risk."). When there are no facts in dispute as to duty, the analysis is a matter of law. See *In re Certified Question*, 479 Mich at 504 ("Whether a defendant owes a duty to a plaintiff to avoid negligent conduct is a question of law . . . .").

We conclude that the facts demonstrate that DTE was well aware of the danger posed by the power lines. Kirco and Oerlikon communicated with DTE before the project began concerning the danger posed by the high-voltage wires, and those communications have relevance to DTE's knowledge surrounding the danger. Further, there are factual disputes between the parties as to the condition of the power lines. And finally, the evidence demonstrates that DTE knew that tall or high-reaching metal tools could potentially come into contact with the power line. As thoroughly discussed above, DTE's Fontanive sent an e-mail to Kirco's Allison agreeing that the lines should be covered during the construction process. In a March 22, 2017 e-mail, Fontanive conveyed this need to Allison: "[Y]ou will need the line protection when construction begins some time in May." In the same e-mail, Fontanive further stated that Oerlikon, Kirco, and DTE should have a

28

joint site meeting to discuss the line covering. After Allison met with DTE representatives, including Fontanive and Colleen Knight, Knight sent an e-mail to Allison informing him that it would not be possible to cover the lines during construction. Both Fontanive and Knight were part of DTE's specialized staff dispatched specifically to address the site's electrical needs and concerns. Knight reported in that e-mail that she had talked to a DTE overhead line supervisor "about adding protection to the 40KV lines and he said that it can not [sic] be done."

Given these communications, DTE knew of the issues at the work site. Moreover, following the Carnwath incident, a DTE employee was immediately notified and dispatched to the site to repair the fallen line, meaning DTE had firsthand knowledge of the potential and practical dangers presented by the high-voltage wires. A question remains whether DTE did enough to address the risks at the job site.[12]

Aside from the clear factual discrepancies presented regarding the maintenance of the power lines, the record demonstrates that a bull float coming into contact with the power lines was foreseeable. For instance, one of Kirco's experts, James Miller, who was involved in the adoption of the 1972 Occupational Safety and Health Administration regulations, agreed that the danger of bull floats contacting power lines was "well known" and "clearly foreseeable." In addition, during the course of discovery, DTE produced a MIOSHA Fact Sheet regarding electrical safety and power line clearances which listed "long-handled cement finishing floats" as a tool known to pose a danger on construction

---

[12] The dissent notes that plaintiff signed a "Weekly Safety Meetings" sheet indicating that he attended a training with Merlo regarding avoiding electric shock. While this is certainly a fact for the jury to consider in assessing contributory negligence, it has little relevance to the determination of whether DTE owed plaintiff a duty in the first instance.

29

sites when handled near power lines.  The MIOSHA Fact Sheet further indicates that to avoid unintended contact with power lines, one should "[r]e-route, de-energize and visibly ground lines, or use other protective measures when working near power lines.  Other protective measures include guarding or insulating the lines."   By underscoring the measures a supplier of electricity should undertake to avoid contact with high-voltage power lines, the MIOSHA Fact Sheet that DTE produced during discovery further supports the *foreseeability* of the danger that occurred.

Furthermore, in addressing the duty question, a court must determine " 'whether it is foreseeable that the actor's conduct may create a risk of harm to the victim . . . .' " *Schultz*, 443 Mich at 452, quoting *Moning*, 400 Mich at 439.  The Court of Appeals here concluded the following as to foreseeability:

> Because DTE reasonably could not have foreseen that a worker would raise a 23$^1/_2$-foot fully extended aluminum bull float vertically into the air underneath the power lines, no duty arose on the part of DTE to protect plaintiff by moving, insulating, de-energizing, or erecting safety barricades around the power lines. [*El-Jamaly*, unpub op at 11.]

The panel asserted that DTE could not have foreseen the injury here because it could not have foreseen the *precise manner* in which the injury would occur.  But this is not the standard.  As the Court held in *Schultz*, "A plaintiff need not establish that the mechanism of injury was foreseeable or anticipated in specific detail.  It is only necessary that the evidence establishes that some injury to the plaintiff was foreseeable or to be anticipated." *Schultz*, 443 Mich at 452 n 7; *Clumfoot v St Clair Tunnel Co*, 221 Mich 113, 117; 190 NW 759 (1922).

30

Indeed, when Fontanive acknowledged in his e-mail communications to Allison that "you will need the line protection when construction begins," it is clear he was well apprised of the looming danger presented by the 40kV lines despite failing to precisely anticipate the manner of plaintiff's eventual injury. Fontanive deemed the line protection necessary precisely because of the *foreseeability* of contact with the lines during the construction process.

The Court of Appeals erred by definitively holding that DTE did not owe a duty to plaintiff. There is a disputed question of material fact as to whether the power lines were improperly maintained by sagging too low to the ground. This issue must be resolved by the fact-finder on remand. If the fact-finder determines that the lines were sagging too low to the ground, then DTE's communications, the Carnwath incident, and other record evidence indicate that plaintiff's injury by electrocution was foreseeable such that DTE had a duty to ensure the power lines near the work area were safe. The fact-finder would then need to determine if DTE breached that duty.

We therefore reverse the Court of Appeals judgment granting summary disposition in favor of DTE.

## VI. CONCLUSION

As to Kirco, we conclude that the Court of Appeals erred by holding that no genuine issue of material fact concerning all four elements of the common work area doctrine existed. Moreover, the Court of Appeals erred by definitively concluding that DTE did not owe plaintiff a duty because there is a question of material fact as to whether the power lines were improperly maintained by sagging too low to the ground. If the fact-finder

31

determines on remand that the power lines were improperly maintained, then the record evidence would support the finding that plaintiff's injury was foreseeable and therefore DTE had a duty to protect plaintiff from the risk of the power lines. Accordingly, we reverse the judgment of the Court of Appeals granting summary disposition to both defendants and remand this case to the trial court for proceedings not inconsistent with this opinion.

Elizabeth M. Welch
Richard H. Bernstein
Megan K. Cavanagh
Kyra H. Bolden

# STATE OF MICHIGAN

## SUPREME COURT

SHAREEF EL-JAMALY,

      Plaintiff-Appellant,

v

      No. 164902

KIRCO MANIX CONSTRUCTION, LLC,
KIRCO DEVELOPMENT, LLC, and DTE
ELECTRIC COMPANY,

      Defendants-Appellees,

and

KIRCO-OM PLYMOUTH, LLC, OERLIKON
METCO (US) INC., GHAFARI
ASSOCIATES, LLC, GHAFARI, INC.,
NATIONAL SAFETY RESOURCE CENTER,
LLC, CHRISTOPHER STREB, and DTE
ENERGY COMPANY,

      Defendants.

---

SHAREEF EL-JAMALY,

      Plaintiff-Appellant,

v

      No. 164903

KIRCO MANIX CONSTRUCTION, LLC,
KIRCO DEVELOPMENT, LLC, and
OERLIKON METCO (US) INC.,

      Defendants-Appellees,

and

KIRCO-OM PLYMOUTH, LLC, GHAFARI
ASSOCIATES, LLC, GHAFARI, INC.,
NATIONAL SAFETY RESOURCE CENTER,
LLC, CHRISTOPHER STREB, DTE ENERGY
COMPANY, and DTE ELECTRIC
COMPANY,

        Defendants.

_____

SHAREEF EL-JAMALY,

        Plaintiff-Appellant,

v                                  No. 164904

KIRCO MANIX CONSTRUCTION, LLC, and
KIRCO DEVELOPMENT, LLC,

        Defendants-Appellees,

and

KIRCO-OM PLYMOUTH, LLC, OERLIKON
METCO (US) INC., GHAFARI ASSOCIATES,
LLC, GHAFARI, INC., NATIONAL SAFETY
RESOURCE CENTER, LLC, CHRISTOPHER
STREB, DTE ENERGY COMPANY, and DTE
ELECTRIC COMPANY,

        Defendants.

_____

CLEMENT, C.J. (*concurring in part and dissenting in part*).

      I join Part V of the majority opinion because I believe that the Court of Appeals

erred by reversing the trial court's denial of summary disposition as to defendant DTE

Electric Company on the basis that DTE did not have a duty to plaintiff. As explained by

the majority opinion, there remains a disputed question of material fact as to whether the

2

power lines were improperly maintained by sagging too low to the ground. This issue must be resolved by a fact-finder on remand. However, I join the dissent as to Parts I through IV of the majority opinion because I believe that the Court of Appeals correctly held that plaintiff failed to establish a claim under the common work area doctrine. As stated in the dissenting opinion, there is no legal basis here to apply the common work area doctrine, given that there was not a high degree of risk posed to a significant number of workers on the job site. Rather, only plaintiff was exposed to the hazard. Accordingly, I concur in part and dissent in part.

Elizabeth T. Clement

# STATE OF MICHIGAN

## SUPREME COURT

SHAREEF EL-JAMALY,

      Plaintiff-Appellant,

v

      No. 164902

KIRCO MANIX CONSTRUCTION, LLC,
KIRCO DEVELOPMENT, LLC, and DTE
ELECTRIC COMPANY,

      Defendants-Appellees,

and

KIRCO-OM PLYMOUTH, LLC, OERLIKON
METCO (US) INC., GHAFARI
ASSOCIATES, LLC, GHAFARI, INC.,
NATIONAL SAFETY RESOURCE CENTER,
LLC, CHRISTOPHER STREB, and DTE
ENERGY COMPANY,

      Defendants.

---

SHAREEF EL-JAMALY,

      Plaintiff-Appellant,

v

      No. 164903

KIRCO MANIX CONSTRUCTION, LLC,
KIRCO DEVELOPMENT, LLC, and
OERLIKON METCO (US) INC.,

      Defendants-Appellees,

and

KIRCO-OM PLYMOUTH, LLC, GHAFARI
ASSOCIATES, LLC, GHAFARI, INC.,
NATIONAL SAFETY RESOURCE CENTER,
LLC, CHRISTOPHER STREB, DTE ENERGY
COMPANY, and DTE ELECTRIC COMPANY,

   Defendants.

_____

SHAREEF EL-JAMALY,

   Plaintiff-Appellant,

v              No. 164904

KIRCO MANIX CONSTRUCTION, LLC, and
KIRCO DEVELOPMENT, LLC,

   Defendants-Appellees,

and

KIRCO-OM PLYMOUTH, LLC, OERLIKON
METCO (US) INC., GHAFARI ASSOCIATES,
LLC, GHAFARI, INC., NATIONAL SAFETY
RESOURCE CENTER, LLC, CHRISTOPHER
STREB, DTE ENERGY COMPANY, and DTE
ELECTRIC COMPANY,

   Defendants.

_____

ZAHRA, J. (*dissenting*).

Plaintiff, a general laborer employed to assist in the laying of concrete, was injured when he removed a bull float, a tool used to smooth newly poured concrete, from a construction site. Plaintiff's injuries resulted when the tool either contacted or nearly contacted an overhead electrical line. Plaintiff knew that power lines ran very near to the

2

area in which he was working, but he had no memory of the accident. Plaintiff initiated this negligence action, asserting multiple theories of liability against a variety of defendants, including Kirco Manix Construction (Kirco), the general contractor and construction manager of the construction project, and DTE Electric Company (DTE), which owned and maintained the power lines. Defendants moved for summary disposition of plaintiff's claims under MCR 2.116(C)(10). The trial court denied their motions, but the Court of Appeals granted defendants' interlocutory appeal and, in an unpublished per curiam opinion, reversed the trial court and remanded for entry of summary disposition in favor of defendants. The panel concluded that under well-settled principles established 50 years ago in *Funk v Gen Motors Corp*,[1] plaintiff did not present evidence sufficient to establish that Kirco failed to take reasonable steps in its supervisory and coordinating role as a general contractor to guard against dangers in a common work area of the construction site such that the danger created a high degree of risk to a significant number of workers on that site. The panel also examined Michigan's negligence jurisprudence and concluded that DTE, a supplier of electricity, did not owe any legal duty to protect plaintiff, a laborer involved in the laying of concrete, from the dangers associated with properly secured and functioning power lines that ran over a portion of a construction site. We granted argument on the application to consider the propriety of the Court of Appeals ruling.[2] The majority

---

[1] *Funk v Gen Motors Corp*, 392 Mich 91; 220 NW2d 641 (1974), overruled in part on other grounds by *Hardy v Monsanto Enviro-Chem Sys, Inc*, 414 Mich 29 (1982).

[2] This is a fact-intensive tort case involving unique circumstances. The Court of Appeals did not break new ground in its assessment of the applicable law. As an error-correcting appellate court of right, it issued a long and dense unpublished per curiam opinion that is, of course, "not precedentially binding under the rule of stare decisis." MCR 7.215(C)(1).

opinion reverses the judgment of the Court of Appeals. In so doing, the majority opinion does not take issue with the appellate court's understanding of the common work area doctrine or general negligence law.

The majority opinion combs the record and cites immaterial facts to conclude that plaintiff presented a jury-submissible question as to whether Kirco is liable for failure to properly supervise and guard against dangers in a common work area and to conclude further that DTE owed plaintiff a duty to guard against the risk of encountering an overhead high-voltage electrical line when laying concrete. I disagree with the majority opinion's analysis of the law and the significance it places on isolated facts drawn from a voluminous record viewed with the benefit of appellate hindsight. The jurisprudence defining the parameters of the common work area doctrine is well settled. No legal duty will be imposed where it is unforeseeable that a plaintiff will—without any cognizable reason— act against his experience, knowledge, and training to cause harm to himself. This case presents no compelling reason to revisit our common work area jurisprudence. Contrary to the conclusion reached in the majority opinion, there is no legal basis to apply the

Plaintiff does not ask this Court to revamp, modify, or revisit any of our well-established negligence law. Plaintiff merely argues the Court of Appeals misapplied the law and is itself in need of error correction. But as Michigan's court of last resort, we are not charged with, nor is it proper and efficient to engage in, a renewed round of error correction. Instead, it is the responsibility of this Court to establish precedent by interpreting oft-cited statutory provisions; to monitor and incrementally mold the common law to reflect the mores, values, and policy choices of Michiganders; and to act as guardians of the state and federal constitutional rights of our residents. This case presents none of these situations. Nevertheless, a majority of this Court engages in an extensive re-evaluation of the facts and questionable applications of law to reverse the Court of Appeals. I disagree with both the majority's decision to involve the Court in this case and its disposition of the matter, because it is the Court of Appeals, and not the majority of this Court, that has properly considered the material facts and applied the law.

4

common work area doctrine when there is not a high degree of risk posed to a significant number of workers on the job site. Here, only plaintiff was exposed to the hazard. Moreover, the establishment of a legal duty under general principles of negligence law is a well-defined test. Plaintiff did not establish that DTE had a duty to prevent the harm that occurred in this case because he did not show that it was foreseeable to DTE that he would—in violation of his training, knowledge, and experience—raise a long, conductive pole beneath power lines. Because the majority opinion's reasoning is flawed, and it may be read to significantly modify longstanding tort principles to the detriment of landowners, general contractors, and power utilities, I dissent.

## I. FACTUAL AND PROCEDURAL HISTORY

In 2017, plaintiff Shareef El-Jamaly worked as a general laborer for Merlo Construction Company. Merlo was subcontracted by Kirco to pour and finish a concrete driveway on a construction project on which Kirco was the general contractor. The driveway extended more than one hundred feet from a building that was under construction to a road, and it passed under a power line. One of plaintiff's duties was to transport concrete finishing tools to and from the Merlo work trucks. Specific to this case, plaintiff was carrying a bull float[3] from the work site back to the truck when, according to his amended complaint, "the said tool inadvertently came close enough to . . . or contacted an energized conductor [on an overhead power line], causing the Plaintiff to sustain severe

---

[3] A bull float is a spatula shaped object used to smooth the surface of poured concrete. The bull float used in this case consisted of four interlocking aluminum segments of roughly 6 feet each that could be extended to approximately $23^1/_2$ feet in length. The interlocking segments could be disassembled at the push of a button. Bull floats can be made of a variety of materials, some of which are conductive material.

and profound electrical injuries[.]"  The parties dispute whether the lowest part of the power line was 16 feet off the ground, $24^1/_2$ feet off the ground, or somewhere in between.

Plaintiff sued Kirco and DTE.  In his deposition, plaintiff stated that he had worked on construction sites for approximately four years and as a laborer in concrete pouring and finishing for three of those years.  Plaintiff had been trained on the general danger posed by active power lines.  Indeed, two weeks before he was injured, plaintiff had signed a training leaflet acknowledging his awareness that he must "[l]ook up and live" and "stay at least 10 feet away from all power lines—no exceptions."  Specific to his work on the Kirco-managed construction site, plaintiff testified that he was aware that there were power lines overhead but that he did not pay attention to them.

Defendants Kirco and DTE moved for summary disposition under MCR 2.116(C)(10).  The trial court denied both motions.  The Court of Appeals reversed in an unpublished opinion, holding that plaintiff failed to establish the first, third, and fourth elements of the common work area doctrine against Kirco.  It also held that DTE was entitled to summary disposition because "DTE reasonably could not have foreseen that a worker would raise a $23^1/_2$-foot fully extended aluminum bull float vertically into the air underneath the power lines, no duty arose on the part of DTE to protect plaintiff by moving, insulating, de-energizing, or erecting safety barricades around the power lines."[4]  Plaintiff applied for leave to appeal in this Court, and we ordered oral argument on the application to consider "whether the Court of Appeals erred in holding that: (1) the defendant Kirco

---

[4] *El-Jamaly v Kirco Manix Constr, LLC*, unpublished per curiam opinion of the Court of Appeals, issued September 1, 2022 (Docket Nos. 355402, 355703, 355932, 356542), p 11.

6

Manix Construction, LLC cannot be held liable under the common work area doctrine; and (2) the defendant DTE Electric Company did not owe a duty to the plaintiff."[5]

## II. COMMON WORK AREA DOCTRINE

At common law, a general contractor cannot be held liable for the tortious negligence of subcontractors or the employees of subcontractors.[6] This Court set forth the common work area doctrine as an exception to this rule of nonliability because:

> [p]lacing ultimate responsibility on the general contractor for job safety in common work areas will, from a practical, economic standpoint, render it more likely that the various subcontractors being supervised by the general contractor will implement or that the general contractor will himself implement the necessary precautions and provide the necessary safety equipment in those areas.[7]

For the common work area doctrine to apply, a plaintiff must establish all four of its elements, which are: "(1) the defendant, either the property owner or general contractor, failed to take reasonable steps within its supervisory and coordinating authority (2) to guard against readily observable and avoidable dangers (3) that created a high degree of risk to a significant number of [workers] (4) in a common work area."[8]

In this case, it is undisputed that Kirco was the general contractor in charge of the work site where plaintiff was injured. Thus, Kirco may be liable for the tortious negligence of its subcontractors if *and only if* plaintiff establishes all four elements of the common

---

[5] *El-Jamaly v Kirco Manix Constr, LLC*, 511 Mich 909, 910 (2023).

[6] See, e.g., *Ormsby v Capital Welding, Inc*, 471 Mich 45, 53; 684 NW2d 320 (2004); *Funk*, 392 Mich at 104-105.

[7] *Funk*, 392 Mich at 104.

[8] *Ormsby*, 471 Mich at 54.

work area doctrine.[9] Contrary to the view expressed in the majority opinion, I conclude that plaintiff's proffered evidence as to the third and fourth elements fails to create a genuine issue of material fact.[10]

## A. ELEMENT THREE: CREATING A HIGH DEGREE OF RISK TO A SIGNIFICANT NUMBER OF WORKERS

This Court has held that the relevant risk for the common work area doctrine is not general safety risks that may be ubiquitous in construction projects but rather the specific circumstances of the risk on the work site, including any safety precautions and mitigation utilized on the site.[11] For example, on a job site where work is performed at elevation, it is not working "at dangerous heights" but working at dangerous heights "without any protection from falls" that is the relevant risk.[12] In this case, the Court of Appeals correctly

---

[9] See *id*. at 53-54.

[10] To survive a motion for summary disposition brought under MCR 2.116(C)(10), plaintiff must show that there is at least a genuine issue of material fact as to the existence of all contested elements of the common work area doctrine.

Concerning the first two elements, it is undisputed that Kirco took steps to ensure that every subcontractor and laborer was aware of the danger of the power lines. These steps included: distributing safety handbooks, posting information on the dangers of the power lines around the work site, conducting safety meetings, and posting large warning signs at various places on the work site. Whether those steps were reasonable and whether the danger was readily observable and avoidable are areas I need not address because plaintiff clearly failed to establish a genuine issue of material fact as to elements three and four of the common work area doctrine.

[11] See *Latham v Barton Malow Co*, 480 Mich 105, 107; 746 NW2d 868 (2008) ("[T]he danger cannot be just the unavoidable, perilous nature of the site itself. Rather, the danger for which a duty attaches is an avoidable danger to which a significant number of workers are exposed[.]").

[12] *Funk*, 392 Mich at 100.

8

defined the risk as "the risk of electrocution from use near the power line of high-reaching conductive tools or equipment capable of reaching the power lines."[13]  The power lines were a high risk only when workers were (1) near the power lines, (2) using high-reaching tools or equipment capable of reaching the power lines, and (3) using tools that were conductive.

We have never held precisely how many workers constitute a "significant number of [workers]," but the reasoning and logic behind the common work area doctrine establishes that the danger must affect multiple subcontractors and enough workers that it is more cost-effective for the general contractor to adopt a set of safety procedures than it would be for the individual subcontractors to guard against the danger.[14]

To be clear, the power lines in this case posed a modicum of risk to every worker on the site, just as the danger of a fall is an unavoidable risk to every worker involved in

---

[13] *El-Jamaly*, unpub op at 14.  The majority opinion acknowledges that this is an apt description of the relevant risk.

[14] See *Funk*, 392 Mich at 104 ("The policy behind the law of torts is more than compensation of victims.  It seeks also to encourage implementation of reasonable safeguards against risks of injury.  Placing ultimate responsibility on the general contractor for job safety in common work areas will, from a practical, economic standpoint, render it more likely that the various subcontractors being supervised by the general contractor will implement or that the general contractor will himself implement the necessary precautions and provide the necessary safety equipment in those areas.  '[A]s a practical matter in many cases only the general contractor is in a position to coordinate work or provide expensive safety features that protect employees of many or all of the subcontractors. . . .  [I]t must be recognized that even if subcontractors and supervisory employees are aware of safety violations they often are unable to rectify the situation themselves and are in too poor an economic position to compel their superiors to do so.' "), quoting *Alber v Owens*, 66 Cal 2d 790; 59 Cal Rptr 117, 121-122; 427 P2d 781 (1967); *Alderman v JC Dev Communities, Inc*, 486 Mich 906, 906 (2010) (holding that "two to six employees of one subcontractor" was not a significant number under the common work area doctrine).

9

constructing a tall building. But the third element of the common work area doctrine is not satisfied by the mere inherent risk of a project; if it were, the exception would swallow the general rule of nonliability for general contractors.[15] Instead, a plaintiff must show that the hazard posed an actual danger to a significant number of workers such that it is more economical and practical for the general contractor to protect against the risk than for individual subcontractors to do so.

Plaintiff attempts to demonstrate a high degree of risk to a significant number of workers by offering two examples of other subcontractors who were put at risk by the power lines. The majority opinion relies on one of these examples to conclude the third element of the common work area doctrine is satisfied; it also relies on general assertions that "multiple [unnamed and unidentified] workers" labored in the area or "had to pass under the power lines" to perform work at the job site. I disagree, concluding neither plaintiff's examples nor the majority opinion specific or general examples are persuasive.

Plaintiff argues that DTE employees were put at risk from the power lines when they, months before plaintiff's injury, used a crane near the power lines to install two switch cabinets.[16] But the installation of switch cabinets is entirely different from the laying of a concrete drive, and the foreseeable risks of one activity are not foreseeable risks of the

---

[15] See *Funk*, 392 Mich at 109-110 (explaining that "[t]he risks inherent in large-scale construction work justify imposing responsibility on a responsible person to take appropriate precautions," and that whether the responsibility should be placed on the subcontractor or general contractor will vary depending on the circumstances).

[16] The evidence in the record does not describe the switch cabinets, their precise location and function, or details about their installation. The only facts relevant to this case are: (1) DTE installed the switch cabinets using machinery capable of reaching the power lines; and (2) the power lines were de-energized.

other.  Indeed, plaintiff acknowledges that the power lines were de-energized during the crane's operation.  This is precisely because the risk of electrocution while operating a crane, which operates well above the ground and very near the high-voltage power lines, is plainly foreseeable.  Those workers were thus not exposed to the same risk to which plaintiff was exposed.  By contrast, none of the work involved in the pouring of a concrete drive requires work near high-voltage lines.  Contrary to the conclusion expressed in the majority opinion, the DTE employees' installation of two switch cabinets actually undercuts plaintiff's argument that a significant number of workers were exposed to the risk of power lines because it shows that DTE and Kirco were aware of the risk and acted to protect against it *when an individual subcontractor needed to go near the lines*.

In fact, the power lines were precisely the kind of danger that ought to be handled by individual contractors and not the general contractor.  Very few subcontractors needed to perform work around the lines; consequently, the hazard of the power lines ought to have been ameliorated on a case-by-case basis by the subcontractors themselves and not by the general contractor.  The common work area doctrine does not open general contractors up to liability for failing to mitigate every potential hazard.  Such a broad-sweeping duty would inefficiently burden general contractors without a corresponding safety benefit.  Indeed, such a broad duty is antithetical to the principles underlying the common work area doctrine.

Plaintiff's second argument, and the example proffered by the majority opinion is that employees of a mass-grading subcontractor were also placed at risk by the power lines.  Like plaintiff's first example, this example also fails to satisfy the third element.  For one, the mass-grading subcontractor performed his work months before plaintiff or any other

11

subcontractor arrived on the work site. While I agree with the majority opinion that the common work area doctrine does not include what the majority opinion calls a "temporal limitation," the fact that only two subcontractors and seven workers[17] were potentially endangered by the power lines and that they were separated by several months is indicative of the kind of hazard that does not threaten a significant number of workers. The common work area doctrine exists to protect consistent, wide-spread dangers, not dangers that are discrete and easily ameliorated by the few subcontractors exposed to them.[18] The majority opinion explains that "[t]here is no temporal limitation under the common work area doctrine," "[n]or is there a requirement that someone first be injured or electrocuted." But the majority opinion reverses the Court of Appeals without explaining why a significant number of workers were endangered by the power lines such that the common work area doctrine should overrule the general rule of no liability for a general contractor. To be clear, I agree with the majority opinion that the common work area doctrine does not include a temporal limitation or prior accident requirement. But I do not read the Court of Appeals' opinion as creating any such requirements; the Court of Appeals examined the evidence before it and determined that the evidence *viewed in totality* established that the power lines were not a hazard to a significant number of workers. The majority opinion nitpicks two of the facts cited by the Court of Appeals, but it does not show a single fact that creates a genuine issue of material fact that a significant number of workers were

---

[17] At the work site in this case, only one employee, the excavator operator, of the mass-grading subcontractor was endangered by the power lines; Merlo had a five-worker crew with one foreman.

[18] See *Ormsby*, 471 Mich at 54.

12

endangered by the power lines. I would therefore not overturn the Court of Appeals' holding.

Compare this case, in which two subcontractors and seven workers were briefly put at risk over a several-month span, with *Funk*, in which a worker fell from a highly visible superstructure that was regularly traversed by thousands of workers employed by at least four different subcontractors over the course of the project.[19] In *Funk*, the danger was pervasive, threatening many workers over a long period of time; consequently, this Court's creation of the common work area doctrine in *Funk*, in which we carved out a very limited exception to the common-law rule that a general contractor is not liable for the tortious negligence of subcontractors or the employees of subcontractors, served the purpose of assigning liability on a narrow basis to the general contractor who is in the best economic and practical position to mitigate the hazard. Here, the danger was fleeting, threatening (at most) two subcontractors whose presence at the work site was separated by several months.[20] All told, plaintiff did not show a genuine and material factual dispute that the power lines posed a high risk to a significant number of workers. Accordingly, defendant Kirco is entitled to summary judgment because plaintiff cannot show a material dispute as to every element of the common work area doctrine.

---

[19] *Funk*, 392 Mich at 99-100, 103-104; see also *Hughes v PMG Bldg, Inc*, 227 Mich App 1, 7-8; 574 NW2d 691 (1997).

[20] Moreover, as will be discussed more below, the majority opinion acknowledges that plaintiff did not establish that the mass-grading subcontractor used a conductive, high-reaching machine. Therefore, it is not clear that the mass-grading worker was exposed to the same risk at all.

The majority opinion focuses on the testimony of Kirco's project manager Duane Allison, who testified at his deposition that other subcontractors worked with equipment that could have reached the power lines. Allison stated that "[e]lectrical, mason, the window company, the siding company, and the roofer" as well as "the cement contractors" all used one of the three kinds of lifting equipment—cranes, lifts, and scissor lifts—that could have reached the power lines. But the fact that other subcontractors used equipment that *could* have reached the power lines does not satisfy the third element because the relevant risk is the use of high-reaching equipment "near the power lines." Indeed, the majority opinion's reading of Allison's testimony ignores the portions that rebut the majority's conclusion. A full reading of Allison's deposition testimony establishes that he testified that electrical, masonry, window, siding, roofing, and cement subcontractors loaded their lifts away from the power lines to avoid exposure to the hazard and that their use of high-reaching equipment did not put them at risk of encountering the power lines. Allison did not testify that the above-listed subcontractors had to work with high-reaching equipment in an area in which the high-reaching equipment could have interacted with the power lines and posed a danger to the workers. His testimony does not support the majority opinion. To the contrary, when read in proper and complete context, it undermines it.

B.  ELEMENT FOUR: IN A COMMON WORK AREA

Plaintiff's failure to establish element three of the common work area doctrine is dispositive. But even if it weren't, his failure to demonstrate any fact-based disagreement as to element four also defeats his claim. "Common" means "belonging to or shared by

14

two or more individuals or things or by all members of a group."[21]  In the context of the common work area doctrine, the group is composed of multiple subcontractors.[22]  To illustrate, if a single subcontractor employs twelve individuals in one work area, but other subcontractors are not present, that does not make the work area "common" for purposes of the common work area doctrine.  The doctrine is focused on the general contractor's duty to the work area as a whole, not dangers presented to individual subcontractors and their workers.  Thus, a work area is "common" when multiple subcontractors are laboring in the same general area and are consequently exposed to similar risks in the area.[23]

The third and fourth prongs of the common work area doctrine are similar, but they address different aspects of the same analysis.  Consider three alternative examples: A general contractor could hire five subcontractors, each of whom employed 50 workers to work in one area; five subcontractors, each of whom employed one worker to work in one area; or one subcontractor who employed 200 workers to work in a single area.  In only the first example would both element three and element four of the common work area doctrine

---

[21] *Merriam-Webster's Collegiate Dictionary* (11th ed); see also *Random House Webster's College Dictionary* (2000) (defining "common" as "belonging equally to, or shared alike by, two or more or all in question").

[22] See *Funk*, 392 Mich at 104 (" '[A]s a practical matter in many cases only the general contractor is in a position to coordinate work or provide expensive safety features *that protect employees of many or all of the subcontractors*.' ") (alteration in original; emphasis added), quoting *Alber*, 59 Cal Rptr at 121-122.

[23] For example, in *Funk*, at least four different subcontractors and thousands of employees labored on the same hazardous building.  *Funk*, 391 Mich at 103; *Hughes*, 227 Mich App at 7.  See also *Ormsby*, 471 Mich at 58 n 9 (" 'We thus read the common work area formulation as an effort to distinguish between a situation where employees of a subcontractor were working on a unique project in isolation from other workers and a situation where employees of a number of subcontractors were all subject to the same risk or hazard.' "), quoting *Hughes*, 227 Mich App at 8.

be satisfied. In the first example, the hazard would threaten a significant number of workers (250 individuals) in a common work area (an area in which five different subcontractors are laboring). Because of the number of workers and the multitude of subcontractors, the purposes of the common work area doctrine—to increase the efficiency and economy of safety procedures—would militate toward the general contractor having a duty to mitigate the hazard. In contrast, the common work area doctrine would not apply in the second example because the hazard would not threaten a significant number of workers; the workers are so few that it would be more efficient for each subcontractor to individually mitigate the hazard. Likewise, in the third example, the work area would not be "common" among multiple subcontractors. Thus, the single subcontractor would be responsible for mitigating the hazard. In this case, plaintiff's claim fails because the power lines were not located in a common work area among the subcontractors.

Just as with element three, plaintiff argued that the work area was common because "[d]uring the construction, DTE installed two switch cabinets that were located almost exactly where Mr. El-Jamaly was standing when the accident occurred" and another subcontractor worked in the area to complete the mass-grading work. Plaintiff admitted that "DTE de-energized the power line for safety when these switch cabinets were installed." But he nevertheless argues that DTE's de-energization of the power line *proves* this was a common work area because their employees were working in the precise area of danger.

But neither example transforms the pertinent area into a "common work area." The DTE workers did not work in the "same" area as plaintiff because the power line was de-energized when they worked near it. Because the power line was the most important

16

feature of the work area, its deactivation made the DTE workers' work area *unlike* plaintiff's work area in the only relevant aspect, the presence of a hazard. Plaintiff and the DTE laborers were thus not exposed to a common risk, and they did not labor in a common work area.

As to the mass-grading subcontractor, plaintiff presented no evidence that the employees of the mass-grading subcontractor used high-reaching *conductive* equipment that put them at risk of injury from contacting the power lines. The mere fact that a subcontractor was under the power lines is not sufficient to transform the area into a common work area, given that these power lines were not the relevant risk. Only workers under the power lines with *conductive* equipment or high-reaching tools capable of reaching the power lines were in the common work area. As we noted in *Ormsby v Capital Welding* in the context of the fourth element, the common work area doctrine applies when "a number of subcontractors were all subject *to the same risk or hazard*."[24]

The majority opinion holds that the Court of Appeals defined the pertinent danger" as "the risk of electrocution from use near the power line of high-reaching conductive tools or equipment capable of reaching the power lines." I too agree with the Court of Appeals' definition. And like the Court of Appeals, I would grant defendant Kirco summary disposition because plaintiff presented no evidence that the grading subcontractor raised a *conductive* tool or machine into the power lines. In fact, plaintiff presented no evidence of any other subcontractor who worked under the power lines using high-reaching, conductive

---

[24] *Ormsby*, 471 Mich at 58 n 9 (quotation marks and citation omitted; emphasis added).

tools. Accordingly, plaintiff failed to establish that he was injured in a common work area.[25]

The majority opinion goes astray by inconsistently defining the relevant hazard. The majority opinion initially defines the hazard as "the risk of electrocution from use near the power line of high-reaching conductive tools or equipment capable of reaching the power lines." But it later redefines the risk into something broader when it applies the rule. For example, when discussing the grading subcontractor, the majority opinion holds:

> The Court of Appeals asserted that there was no evidence that "any subcontractors other than Merlo were using high-reaching conductive tools or equipment capable of reaching the overhead power lines." But, as noted above, this is incorrect.

> \* \* \*

> *There were multiple subcontractors using equipment that could reach the high-voltage wires*, including the operator employed by [nonparty subcontractor] Carnwath, who in April 2017 allegedly severed the same lines that later caused plaintiff's injury. [Emphasis added.]

While the majority recognizes that only workers who used conductive tools were at risk, it nevertheless holds that workers for the grading subcontractor were at risk *without holding that they used conductive tools*. There is no record evidence that the grading contractor used conductive tools or machinery. It is plaintiff's duty to show a genuine issue of material fact on this point, something he did not do.

The majority opinion buttresses its erroneous holding by citing site manager Allison's testimony that multiple subcontractors used cranes, lifts, and scissor lifts. But, as previously noted, Allison did not testify that any subcontractors used cranes, lifts, or

---

[25] See *id*. at 53-54.

scissor lifts *under the power lines*. Indeed, he and the attorney deposing him argued throughout the deposition as to whether any subcontractor was ever in the zone of danger. Consequently, Allison's testimony does not support the majority opinion's holding that multiple subcontractors were exposed to the same hazard. The majority opinion ignores the details and subtleties of Allison's deposition and the defined risk to hold the work area "common." Neither the evidence of the grading subcontractor's activities nor Allison's testimony independently supports the existence of a common work area. And taken together, neither fixes the shortcomings of the other.

In sum, the majority opinion redefines the hazard and greatly expands general contractors' liability without acknowledging that it is so doing. The majority opinion does not apply *Funk* and its progeny to this case. It flies in the face of *Funk*, disrupting 50 years of well-developed and, until now, easily understood law known as the common work area doctrine. Now, general contractors will be liable for injuries that occur on the work site *even when no other person was exposed to the hazard*. I dissent from the majority opinion's subversion of the common work area doctrine by making general contractors liable for a broad swath of dangers that should be addressed by subcontractors who can more economically, precisely, and efficiently guard against hazards that threaten only their own crews.

## III. DTE'S TORT LIABILITY

As with all negligence torts, DTE is liable for plaintiff's injuries only if plaintiff establishes that DTE (1) owed him a duty of care and (2) breached that duty, (3) causing,

both actually and proximately, (4) plaintiff's injuries.[26] To survive a motion for summary disposition brought under MCR 2.116(C)(10), plaintiff must show that there is a genuine issue of material fact as to all contested elements. Contrary to the conclusion expressed in the majority opinion, I conclude plaintiff's claim against DTE fails on the first element, the existence of a duty. DTE is therefore entitled to summary disposition.

It is bedrock tort law that a defendant only has a duty to prevent *foreseeable* injuries to the plaintiff.[27] Put another way, a defendant does not have a duty to prevent unforeseeable injuries or injuries that occur because of unforeseeable conduct. In *Clumfoot v St Clair Tunnel Co*,[28] this Court was asked to decide whether the defendant owed the plaintiff a duty of care after the plaintiff, a railway worker, reached his hand up and touched a wire, resulting in severe injuries. This Court established a test to determine when a defendant power company owes a plaintiff a duty of care. "The test to be applied is: Was there a likelihood or reasonable probability of human contact with the wires by persons who had a right to be in a place from which such contact was possible? If so, the danger should have been foreseen or anticipated by the defendant."[29]

---

[26] See, e.g., *Connelly v Paul Ruddy's Equip Repair & Serv Co*, 388 Mich 146, 150; 200 NW2d 70 (1972) ("In the case of an action for damages arising out of tortious injury to a person, the cause of action accrues when all of the elements of the cause of action have occurred and can be alleged in a proper complaint. Those elements are four in number. (1) The existence of a legal duty by defendant toward plaintiff. (2) The breach of such duty. (3) A proximate causal relationship between the breach of such duty and an injury to the plaintiff. (4) The plaintiff must have suffered damages.").

[27] There are exceptions to this rule, but none of the exceptions applies here. In fact, plaintiff does not even argue that any of the exceptions apply.

[28] *Clumfoot v St Clair Tunnel Co*, 221 Mich 113, 115; 190 NW 759 (1922).

[29] *Id*. at 117.

More recently, in *Schultz v Consumers Power Co*,[30] this Court considered whether a power company owed a duty of care to a plaintiff who was electrocuted by a pitted, corroded, and frayed wire that was 15 feet from a portion of the plaintiff's house that required maintenance. This Court held that the proper test for determining whether the power company owed a duty was "not whether the company should have anticipated the particular act from which the injury resulted, but whether it should have foreseen the probability that injury might result from any reasonable activity done on the premises for business, work, or pleasure."[31] In *Schultz*, this Court concluded that the defendant power company owed the plaintiff a duty of care because:

> Consumers Power should have realized that homeowners generally maintain their homes. This may include washing windows, cleaning troughs, repairing the roof, cleaning gutters, and, certainly, painting. Considering the proximity of the uninsulated primary wire to the house (roughly fifteen horizontal feet and twenty-four vertical feet from the ground), it was foreseeable that someone making repairs could be injured by a dilapidated wire.[32]

A key aspect of *Schultz*—and one the majority opinion ignores—is that the plaintiff homeowner had a reason to be near the power line (routine home maintenance), and the defendant power company ought to have foreseen that the plaintiff would have to be in close proximity to the wire because home maintenance is a universal facet of home ownership. Put another way, the foreseeability of an injury is partly premised on whether the defendant ought to have known that the plaintiff would attend to affairs that routinely

---

[30] *Schultz v Consumers Power Co*, 443 Mich 445, 447-448; 506 NW2d 175 (1993).

[31] *Id*. at 452.

[32] *Id*. at 453.

would be done that would place the plaintiff in dangerous proximity to a high-voltage power line.

This Court addressed this precise point of law twice in *Groncki v Detroit Edison Co*.[33] *Groncki* consolidated different power-line tort cases that involved the same question: whether the defendant power company owed the plaintiff a duty of care.[34] In the first case, this Court held that even though the defendant "knew that there was ongoing construction," it owed the plaintiff no duty of care because it "had no reason to know that any high profile machinery would be used near its power lines" and defendant "could not have reasonably foreseen that a worker would reverse around a pile of debris and bring a twenty-nine-foot high uncollapsed scaffold into contact with its electric wire."[35]

In the third case, this Court also held that the defendant did not owe a duty of care to the plaintiff because, "[s]imply put, it was not foreseeable to [the defendant] that an experienced, skilled workman would disregard clear instructions and operate his delivery vehicle directly beneath power lines. Thus, no duty arose on the part of [the defendant] to [the] plaintiff."[36] Two principles are deducible from these holdings: a defendant does not owe a duty of care to a plaintiff to prevent unforeseeable harm, and a harm is unforeseeable

---

[33] *Groncki v Detroit Edison Co*, 453 Mich 644, 658; 557 NW2d 289 (1996) (opinion by BRICKLEY, C.J.).

[34] The analysis of Chief Justice BRICKLEY's lead opinion in *Groncki* with respect to the second case only received support from two other justices, with a fourth justice concurring in the result only. As a result, although a majority of this Court concluded that the power company did not owe the plaintiff a duty of care, no description of that conclusion gained majority support. Therefore, I do not discuss this case in detail.

[35] *Id*. at 657.

[36] *Id*. at 660.

when a plaintiff with experience around power lines and construction sites disregards the known peril of a power line without cause and to his or her own detriment.

The record in this case shows that plaintiff was an experienced worker aware of the dangers posed by power lines. Plaintiff testified that he graduated high school in 2013 and attended Wayne State University for three or four semesters immediately after graduation. While taking classes at Wayne State, plaintiff worked as a general laborer for a lawn care and landscaping business and at A-Land Construction as a general laborer in concrete. Plaintiff began working at Merlo in October 2017 as a general laborer in concrete. He testified that his duties at A-Land Construction and Merlo were the same, both companies used the same tools, and at both jobs one of his duties was to transport bull floats to and from the job site. Plaintiff also testified that he was aware that there were overhead wires at the Kirco job site, although he did not pay close attention to them. More generally, plaintiff stated that he could not remember ever being taught about the dangers of overhead wires. Nevertheless, his signature is on a "Weekly Safety Meetings" sheet dated October 30, 2017—two weeks before his injury—and titled "Avoid Electric Shock." The sheet warned subcontractors to:

> **Keep a safe distance from overhead power lines**. You should always stay at least 10 feet away from all power lines—no exceptions. The minimum distance is longer for higher voltages. Remember the old construction saying, "Look up and live." Make looking up one of the first things that you do before starting any work. Don't get so involved in your work that you fail to pay attention to what is happening and changing around you. Keep in mind that you don't need to physically touch an overhead power line to suffer a fatal shock. Just being too close can be enough for the electricity to arc and kill you.

23

The evidence establishes that it was unforeseeable to DTE that plaintiff would fail to disassemble the bull float and reduce it to its transportable size and instead raise this long, conductive metal pole directly into the area of the power lines, electrocuting himself. Plaintiff was familiar with construction sites, having spent approximately four years working as a landscaper and concrete laborer. While he had never worked on power lines directly, he was aware of the danger of power lines and was warned in detail about the unusually high risk of electricity on job sites—particularly about the danger of overhead power lines.

Plaintiff here differed from the plaintiff in *Schultz*—in which we held that the power company should have foreseen the risk of electrocution—in two important ways. First, plaintiff "was not a homeowner unfamiliar with the dangers of electric lines."[37] In fact, plaintiff had several years of experience on construction sites. And he was warned about the danger posed by overhead wires a mere two weeks before his injury. He also stated that while he was aware that power lines were overhead, he did not bother—or at least could not recall—looking up to check exactly where the power lines were.[38]

Second, plaintiff had no reason to be near the power lines. In *Schultz*, we held that the power company ought to have foreseen the danger because "homeowners generally maintain their homes. This may include washing windows, cleaning troughs, repairing the

---

[37] *Groncki*, 453 Mich at 659 (opinion by BRICKLEY, C.J.) (distinguishing the plaintiff in *Groncki* from the plaintiff in *Schultz*).

[38] The majority opinion rewards plaintiff for ignoring his safety training and failing to pay attention to the power line's location. Because it is perverse and contrary to the common work area doctrine to incentivize workers to not look for hazards in their area, the majority opinion errs.

roof, cleaning gutters, and, certainly, painting."[39]  In contrast, plaintiff had no reason to lift the $23^{1}/_{2}$-foot metal bull float into the air such that it could reach the power lines.  And his coworkers testified that he was supposed to either disassemble the bull float before transporting it or carry it horizontal to the ground.

Plaintiff is similar in all relevant respects to the two *Groncki* plaintiffs discussed above—both of whom were not owed a duty of care by the respective defendants.  Plaintiff had experience around power lines and construction sites yet disregarded the known peril of the power lines without cause and to his detriment.  It was not foreseeable that a knowledgeable, experienced construction worker aware of the danger of overhead power lines would, without reason, carry a conductive metal pole such that it could reach the power lines.  Consequently, DTE did not owe plaintiff a duty of care.

The majority opinion frames the outcome of this case as a logical and natural extension of caselaw when it is actually a marked departure from prior decisions of this Court.  The majority opinion silently overrules *Groncki* without serious discussion, and it casts serious doubt on the core holding of *Schultz*.

More radically, the majority opinion changes the focus of power-line tort law, turning the inquiry on its head.  Rather than focusing on plaintiff and his experience, knowledge, and reasons for being near the power lines, to determine whether it was foreseeable to the power company that he would be near the power lines, as this Court did in *Groncki* and *Schultz*, the majority opinion focuses exclusively on DTE.  The majority opinion holds: "In the instant case, the issue of whether DTE owed plaintiff a duty rests

---

[39] *Schultz*, 443 Mich at 453.

25

upon whether contact with the power lines by high-reaching conductive equipment was foreseeable." The majority opinion conflates breach of duty with the question of duty. Whether DTE took reasonable steps to ensure safety at the job site is related to the question of breach, and it is not dispositive of whether a legal duty exists. Likewise, "whether the power lines were improperly maintained" is a question of breach. The majority opinion thus errs insofar as it looks at evidence of a purported breach to determine the existence of a duty.[40]

It was unforeseeable that an experienced, knowledgeable, trained construction worker would lift a $23^1/_2$-foot-long metal pole such that it could reach the power lines that he knew were overhead. DTE did not, therefore, owe plaintiff a duty of care.

## IV. CONCLUSION

The majority opinion is factually wrong because it miscites the record and ignores uncontested facts that are decisive. It is legally wrong because it misapplies the law in a way that may confuse the lower courts and lead to further misapplication of the common work area doctrine and tort liability. As explained above, the common work area doctrine does not apply to this case because plaintiff did not establish a genuine issue of material fact about the third and fourth elements of that doctrine; consequently, Kirco is entitled to

---

[40] The majority opinion denies DTE the summary disposition which it is owed under law and revives plaintiff's doomed case by relying on irrelevant factual debates. For example, the majority nitpicks the Court of Appeal's holding that plaintiff held the bull float vertically. But the majority opinion agrees with the Court of Appeals' conclusion that the risk in this case was only present for those using high-reaching tools. That conclusion, coupled with the fact that plaintiff was injured, necessarily means that he was using the bull float as a high-reaching tool. It would be nonsensical to argue that a $23^1/_2$-foot pole (i.e., a high-reaching tool) held horizontally to the ground presented a greater danger than a 6-foot pole or a 3-foot pole (i.e., a tool that was not high-reaching) held horizontally to the ground.

26

summary disposition. Likewise, DTE did not owe plaintiff a duty of care because it was unforeseeable that a construction worker who was familiar with the dangers of construction sites, trained on the dangers of electricity, and aware of overhead power lines would lift a $23^1/_2$-foot-long conductive pole near the power lines. Because the majority opinion holds otherwise, thereby creating instability and uncertainty in these critical areas of negligence law, I dissent.

Brian K. Zahra
David F. Viviano

27